71 P.3d 1062

**Mabel E. REDMAN, Claimant–Appellant,**

v.

**STATE of Idaho, INDUSTRIAL SPECIAL INDEMNITY FUND, Defendant–Respondent.**

No. 28134.

Supreme Court of Idaho,
Boise, January 2003 Term of Court.

June 5, 2003.

Troupis & Summer, Meridian, for appellant. D. Scott Summer argued.

Hon. Lawrence G. Wasden, Attorney General, Boise, for respondent. Thomas B. High argued.

SCHROEDER, Justice.

Mabel E. Redman (Redman) asks the Court to reverse the findings of fact and conclusions of law of the Industrial Commission, which concluded that she had suffered a total work impairment from several injuries prior to her 1997 accident and was thus not entitled to relief from the Industrial Special Indemnity Account.

**I.**

**BACKGROUND AND PRIOR PROCEEDINGS**

Redman has been a store clerk since she was 16 years old. On October 5, 1985, while working at the U–Tel–Em market, she sustained a serious back injury when she tried to catch two bags of water softener salt as they fell off a cart. She was 56 years old at the time. Subsequent back pain kept her from work for several weeks. On October 7th and 10th she saw Dr. Martin McDonald who diagnosed her with acute muscle strain and prescribed aspirin and exercises. Still unable to return to work because of back pain, she saw Dr. Alan White on November 13th, who diagnosed her with thoracolumbar strain with resultant subluxation and associated radiculitis. He stated in his report to the Industrial Commission that she should undergo conservative chiropractic care and that her condition be watched. She eventu-

ally came under the care of Dr. Jon Dahlin, who stated in January of 1986 that she had "plateaued for the last two months and any time she increases her activities she has acute exacerbation of pain and has to lie down most of the following day." He also concluded that "it is doubtful that she will be able to return to this type of work in the near future." On January 22, Dr. Dahlin discovered she had spondylolytic spondylolisthesis grade I at L5–S1, which was a preexisting lesion that may have predisposed her to the injury. He decided that she could "return to her work at a lighter type work capacity." In February of 1986 Redman told Dr. Dahlin she wanted to return to work, and he agreed stating she "can safely resume her previous employment." His final assessment in April was that she had "no permanent impairment" and that "no further active medical treatment or follow up anticipated." Later that month, Dr. Dahlin recommended that Redman get a lumbosacral support to wear on the job.

Redman entered into a lump sum agreement with U–Tel–Em that was approved by the Industrial Commission. Her medical costs of $2,360.16 were paid, and she received $3,057.95 in temporary disability compensation and $2,000 in consideration of her waiving all her claims.

Redman continued work at the U–Tel–Em market until 1987 when she hurt her back again while trying to load a bag of dog food into the back of a car. She came under the care of Dr. Gary Bills who believed she had lumbar spondylolysis of the L5 with minimal listhesis and recommended that she avoid bending or twisting her back. Apparently, U–Tel–Em market informed Dr. Bills that it did not have any work for Redman that did not involve bending or lifting, and Redman told Dr. Bills she could not do the work they asked of her because of her back. Dr. Bills concurred that Redman could not work and stated that she probably had a permanent impairment regarding her persistent lumbar pain. Dr. Bills reported to the Industrial Commission that Redman had a 10% impairment rating of the whole person—5% from the 1985 accident and another 5% from the 1987 accident—and that she could only per-

form work requiring lifting 15 pounds or less and that did not require bending the lumbar spine. Redman and U–Tel–Em entered into another lump sum agreement with the Industrial Commission in which she received $34,000 for discharge of U–Tel–Em's current and future liability.

After the second accident, no work could be found for Redman given her injuries, education, job experience and age—she was 59 years old in 1987. A consultant with the Industrial Commission Rehabilitation Division worked with her for several weeks trying to find new employment, but the jobs available required too much lifting, and eventually Redman did not make further efforts to find work. She was out of work for six years until 1993 when a friend, a Ms. Wilkins, told her "you're going to go to work." Ms. Wilkins and Redman had worked together at U–Tel–Em and Ms. Wilkins now worked at a local Maverik store. The Maverik store needed a baker. Redman testified that Ms. Wilkins was aware of her back problems but that the Maverik supervisor agreed that she could work as many hours as her condition permitted and then go home. Redman states that she was required to do "the baking. But if there was anything else that needed to be done, you had to do it. Fill the pop cases. Scrub the floors. Or whatever." She states she went to work

at four in the morning. And the next person didn't come in until usually 9:00 or 10:00. Just depending. And I would usually have to work. So it would usually be from 4:00 to when I got done. Unless it was a real slow . . . . [or] unless some of my girls didn't show up. But usually they would show up between 9:00 and 10:00. And if they didn't show up, somebody had to be there. So I stayed.

Redman said her back bothered her, "but not that I couldn't do my work. I just had to take it easy and do it slower than what I normally would. But I managed to do it all." She also stated that "not very often did I go home with my back hurting. If I had my work to do, I finished it out. I may hurt when I got home. But I worked until my work was all done. What was needed. Unless I was really down, then I would leave.

Then I would usually end up going to a back doctor to have some work done on it to relieve the pain." She did realize that her doctors heretofore had prescribed weight limitations on what she could lift, but she stated she used her "own judgment on what [she] could do."

In May of 1997, Redman injured her hip while unstacking milk crates. Severe and persistent pain ensued whenever she was required to stand for any length of time, and she subsequently had to leave work because new management wanted someone who could stand and function for a whole eight hours. She describes the difference before and after the accident:

> Oh, before the accident I could go all day shopping and do anything. Now I go get what I want and head for home and that is just about it. I don't venture out a lot. And don't spend a lot of time out. If I can go someplace, and then go sit down or something, then I'm all right. But not just to walk and be up and around all the time.

In an independent medical examination in 1997 Dr. Robert Friedman concluded that Redman sustained no permanent medical impairment, that she "sustained an exacerbation of her pre-existing condition" of her spondylosis and arthritis and that her "increasing arthritic complaints ... [are] consistent with her pre-existing condition and its natural history." He also stated that she could return to work within certain restrictions—50 pounds occasional lifting, 25 pounds repetitive lifting, and no torquing of her back. Dr. Friedman's conclusions were supported by another independent medical exam by Dr. Monte Moore in 1999. Redman, however, feels she had been permanently disabled, stating, "The way I feel, and knowing what I can and can't do, why, I don't think I could ever hold down a steady job. Because I couldn't take the long hours, and the lifting, and what have you." In a medical examination conducted at the behest of her attorney, Dr. Michael O'Brien indicated she had sustained a 5% impairment of the whole person and that her current disability was "solely related to that injury and not to a preexisting injury," believing she had developed piriformis syndrome. These conclusions were supported by a vocational rehabilitation expert, John Janzen, who stated Redman was permanently disabled and met the criteria for the odd-lot doctrine given her physical and vocational limitations. Redman did look for work after her last accident, but she was eligible only for clerking jobs that required intolerable amounts of standing and bending.

Redman sought compensation from both Maverik and the Industrial Special Indemnity Fund (ISIF) under I.C. § 72–332. The ISIF pays for the remainder of income benefits for workers who, while partially disabled from previous accident, have become totally disabled in a subsequent accident, relieving their current employer from liability for possible aggravations of the worker's previous condition by the subsequent accident. *See* I.C. § 72–332. Maverik settled for $15,000, but the claim against the ISIF was rejected. The Commission found she was an odd-lot worker before her employment at Maverik, concluding that the 1997 accident did not significantly change her condition; that she was permanently disabled before 1997; and, that her job at Maverik was only obtained because Maverik was a sympathetic employer. Consequently, she was not eligible for relief from the ISIF, which requires there to have been a previous disability that when combined with a subsequent accident, totally disabled the worker.

Commissioner R.D. Maynard dissented from the Commission's decision on the basis that, *Bybee v. State, Industrial Special Indemnity Fund,* 129 Idaho 76, 921 P.2d 1200 (1996), interpreting I.C. § 72–332, merely requires that a petitioner show she was regularly employed at the time of the recent injury that supposedly rendered her totally disabled. Such a showing raises a presumption that she was not an odd-lot worker, i.e. a previous injury when combined with her education and other factors of employability effectively rendered her totally disabled and unemployable. According to the dissent, the burden shifts to the ISIF, which must not only show the worker was employed through unusual, irregular circumstances, such as a sympathetic employer, but also that no other suitable employment was available.

## II.

### THE COMMISSION'S DECISION THAT REDMAN'S INJURY WAS PREEXISTING IS SUPPORTED BY SUBSTANTIAL, COMPETENT, THOUGH CONFLICTING EVIDENCE

Redman maintains that she was not an odd-lot worker before her 1997 injury because she worked full time for six years at a clerking job, fulfilling all the tasks and duties required of her. She argues that her previous injuries did not significantly impair her ability to work as a clerk, and she needed no special consideration in holding down the job. Her regular employment raises the presumption she was not an odd-lot worker.

The ISIF argues that her employment was due to a sympathetic employer, and that she failed to prove her recent accident when combined with her previous disability caused her total impairment. ISIF maintains that she must have been totally impaired before her most recent accident, relying on medical records which state her most recent pain was due to an aggravation of a previous injury, not a new one.

There is medical evidence that indicates that Redman's recent injury to be nothing more than an aggravation of her previous condition. The Commission states, "The combination of medical and vocational records and opinions shows it more likely than not that Claimant's permanent disability before the 1997 accident was no different than afterward." There is evidence to support this conclusion, though it is clearly contradicted by other evidence and the opposite conclusion could be reached reasonably. Since there is evidence to support this conclusion it is not necessary to address the Commission's determination that Redman was otherwise unemployable but for a sympathetic employer.

## III.

### ATTORNEY FEES

ISIF seeks attorney fees noting that this Court has awarded them before against Industrial Commission claimants who only ask this Court to reweigh the evidence and present no substantive legal issues. *See Baker v. Louisiana Pacific Corporation,* 123 Idaho 799, 853 P.2d 544 (1993). However, Redman has clearly represented a compelling, though unsuccessful, argument concerning the Commission's findings and conclusions, supported by the dissent of one Commissioner.

## IV.

### CONCLUSION

The decision of the Industrial Commission is affirmed. ISIF is awarded costs. No attorney fees are allowed.

Chief Justice TROUT, Justices WALTERS and EISMANN concur.

Justice KIDWELL, dissents without opinion.